Affirmed and Opinion filed January 26, 2006









Affirmed
and Opinion filed January 26, 2006.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00357-CV

____________

 

BRUCE
LUNDSTROM AND VONNIE LUNDSTROM, Appellants

 

V.

 

UNITED
SERVICES AUTOMOBILE ASSOCIATION B CIC, Appellee

__________________________________________________________

 

On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 02-60356

__________________________________________________________

 

O P I N I O N








In this homeowners insurance
coverage case, we primarily examine the propriety of the insurer=s denial
of coverage under the 1996 revised version of the Homeowners Form B (HO-B)
insurance policy as prescribed by the Texas Department of Insurance.  The case is before us on the Lundstroms= (the
insureds=) appeal
from a summary judgment in favor of appellee United States Automobile
Association-CIC (AUSAA@), the
insurer.  Because (1) the summary
judgment proof conclusively establishes USAA=s
defenses to the Lundstroms=
contractual and bad faith claims and (2) the Lundstroms did not produce
evidence to support their claim under former Insurance Code Article 21.55, we
affirm.

I.  Factual and Procedural Background

In June 1998, the Lundstroms
purchased a townhome from Gary Baker, the townhome=s
builder.  The Lundstroms paid $279,900
for the townhome, moved in immediately, and insured the dwelling with USAA for
$256,000.[1]

Shortly after they moved in, the
Lundstroms noticed water entering the townhome. After a storm in the Aearly
fall, late summer of >98,@ the Lundstroms
found water in the stairwell.  The
Lundstroms called Baker to tell him about the problems.  They did not notify USAA.

In the fall of 1998, the
Lundstroms noticed more water was entering the townhome. They saw one or two
wet spots, five or six inches in diameter, on the ceiling.  Again, the Lundstroms called Baker, but did
not contact USAA.

In February 1999, Vonnie
Lundstrom wrote Baker complaining about continued leakage in the master
bathroom and a damp, musty odor in the first floor stairwell.  She also expressed concern that excess
moisture was seeping through the foundation. 
As on the two prior occasions, Lundstroms did not contact USAA.

In the early summer of 1999, the
Lundstroms noticed still more water leakage during some rainstorms.  The water problems continued throughout that
summer.  The Lundstroms continued to
notify Baker, but did not inform USAA. 
Baker tried to fix the problems and to repair the water damage to the
Lundstroms= townhome.  However, in July 1999, his workmen failed to
properly cover a hole they cut in the Lundstroms= fourth‑floor
patio/roof.  During a rain, water came
through the hole, damaging clothes, carpet, and books.  The Lundstroms wrote Baker and offered to Asettle
this matter for $700,@ but
again did not contact USAA.








In April 2000, the Lundstroms
experienced leaks in the master bathroom, master closet, and stairwell during
some heavy rains.  More water stains and
water spots appeared on the ceiling.  The
Lundstroms again contacted Baker, but not USAA. 
Shortly thereafter, Baker again attempted to address the water
problems.  As part of Baker=s attempt
to fix the problems, his contractors again cut a hole in the fourth‑floor
patio/roof.  The workers left the hole
uncovered, and a heavy rain fell.  Around
May 20, 2000, rain poured into the townhome through the hole.  In late May 2000, the Lundstroms reported a
claim to USAA.

On June 5, 2000, the Lundstroms
filed a pro se lawsuit against Baker individually, his construction
companies, and the real estate agent who sold the Lundstroms the townhome (the ABaker
lawsuit@).   Four days later, the Lundstroms wrote Baker
complaining about his faulty attachment of a protective tarp on the fourth‑floor
patio/roof and reported that, because the tarp did not hold, rain again poured
into the townhome.  They also complained
Baker had intentionally plugged the drain on the fourth‑floor patio/roof
so rainwater could not go down the drain, and therefore had nowhere to go
except into the townhome itself.

From mid-April to mid-June 2001,
All-Around Plumbing Company, HDR Engineering, and Casteel Automatic Fire
Protection performed various tests and inspections on the townhouse.  All-Around found no leaks in the townhome=s domestic
water system or sanitary sewer system.








On the northeast corner of the
townhouse, HDR found a soda can in the interior of the downspout near the
bottom of the scupper box.[2]  The soda can obstructed the downspout and the
scupper, blocking normal flow in the scupper system and allowing rainwater to Apond@ on the
roof.  According to HDR, this blockage
caused (1) staining of the wall and ceiling finishes and the wall framing at
the stairwell between the second and third and third and fourth levels, (2)
deterioration of the wall framing in the stairwell between the second and third
levels, and (3) staining of the wall framing in the entry closet riser room and
the main entry porch.

Casteel Automatic Fire Protection
tested the fire sprinkler system. 
Casteel found the fire sprinkler system was Aturned
off and dry,@ i.e., Ashut
down.@  Casteel also found the fire sprinkler system
had not been inspected, monitored, or maintained.

When Casteel activated the system
to test it, water leaked from the ceiling of the riser closet, located in the
northeast corner of the townhouse.  Leaks
also appeared in the air conditioner closet on the fourth floor, around the
main entry door frame, and in the ceiling finish in the front porch.  Casteel removed an area of ceiling finish and
found a leak on the line serving the fire sprinkler heads below the stairwell
between the first and second levels. 
Casteel disconnected the pipe to test the remainder of the system.  At a pressure of forty-eight pounds per
square inch (psi), Casteel did not find any other leaks.

At some point, a disagreement
arose between USAA and the Lundstroms regarding coverage.  On July 17, 2001, USAA denied coverage for at
least some of the Lundstroms= claimed
losses.[3]

In November 2001, USAA exercised
its contractual right to a binding appraisal regarding the damages to the
interior of the townhome caused by the Ainitial
wetting.@  The Lundstroms received notice of the
impending appraisal, but did not participate.

The appraisal umpire awarded the
Lundstroms $4,226.19 ($1,666.19 after the deductible) for the initial
wetting.  USAA tendered payment of
$1,666.19 to the Lundstroms, and they deposited the check.








On September 17, 2002, the
Lundstroms settled with the Baker lawsuit defendants.  The parties executed a ACompromise
Settlement Agreement and Mutual Release,@ under
which the Lundstroms were to receive a gross total sum of $400,000.  The real estate agent contributed $45,000 and
Baker contributed $355,000.  As part of
his contribution, Baker agreed to repurchase the townhouse from the Lundstroms
for $95,000, and the sale was completed two days later.  According to the terms of the settlement
agreement, in addition to the $95,000 allocated for the purchase price of the
townhouse, $30,000 was allocated as payment for damages to household contents
and furnishings, and $275,000 was allocated as payment for Aclaims
for damages for personal physical injuries or physical sickness allegedly
suffered by the Lundstroms.@








Two months after settling the
Baker lawsuit, the Lundstroms sued USAA, alleging breach of the insurance
contract, breach of the duty of good faith and fair dealing, violation of the
Deceptive Trade Practices Act B Consumer
Protection Act (DTPA),[4]
unfair insurance practices,[5]
and violations of former Insurance Code article 21.55.[6]  USAA moved for summary judgment on
traditional and no evidence grounds.  In
the traditional portion of its motion, USAA argued that the Lundstroms=
contractual claims were barred on the following grounds:  (1) as a result of the Baker lawsuit, res
judicata precluded the present suit, (2) the Lundstroms=
settlement in the Baker lawsuit had fully compensated them for the damages
claimed in the present lawsuit,[7]
(3) the Lundstroms= claimed
losses were excluded under the insurance policy, (4) the Lundstroms failed to
segregate covered and non-covered losses, (5) the Lundstroms failed to provide
USAA with timely notice of their claims, and (6) there was a binding appraisal
of the covered claims.  USAA asserted
that the extra-contractual claims for violation of the duty of good faith and
fair dealing (the Abad faith
claim=), DTPA
violations, and violations of the insurance code were barred because a good
faith dispute existed regarding coverage. 
In the no-evidence portion of its motion, USAA argued there was no
evidence of one or more specified elements of each of the Lundstroms= causes
of action.

The trial court granted USAA=s motion
without specifying the grounds and dismissed all the Lundstroms= claims
with prejudice.  In multiple issues and
arguments, the Lundstroms now challenge the trial court=s summary
judgment in favor of USAA on all of the Lundstroms= causes
of action.

II.  Issues
Presented and Standard of Review








The Lundstroms frame their issues as follows: (1) whether the
summary judgment should be reversed; (2) whether the law bars an insured who
suffers covered and uncovered losses from suing the tortfeasor to recover
uncovered damages and then suing the insurance company for covered losses; (3)
whether USAA conclusively proved none of the Lundstroms= losses were covered by their HO-B
policy; (4) whether more than a scintilla of evidence supports the Lundstroms= contract claim; (5) whether
legally sufficient evidence supports the Lundstroms= bad
faith claim; (6) whether more than a scintilla of evidence supports the
challenged elements of the Lundstroms=
Insurance Code and DTPA claims; (7) whether legally sufficient evidence
supports the Lundstroms= recovery
under former article 21.55 of the Texas Insurance Code; and (8) whether the
appraisal clause negates the Lundstroms= right to
recover from USAA.[8]  The Lundstroms then argue (1) if preserved,
USAA=s
objections to summary judgment evidence should be denied; (2) USAA did not
conclusively prove the Aone
satisfaction rule,@ res
judicata, or a dollar for dollar settlement credit bars their claim; (3)
USAA did not conclusively prove it was entitled to summary judgment on
coverage; (4) the Lundstroms presented legally sufficient summary judgment
evidence on each element of the causes of action USAA challenged in its no
evidence summary judgment motion; (5) USAA did not conclusively prove the
appraisal clause bars their claim for breach of contract; and (6) USAA did not
conclusively prove the Lundstroms failed to timely notify USAA of their loss.  Although the Lundstroms=
arguments do not directly mirror their issues, their issues and arguments are
directed at USAA=s alleged
grounds for summary judgment and challenge the propriety of the trial court=s summary
judgment in favor of USAA.

A defendant moving for
traditional summary judgment assumes the burden of showing as a matter of law
the plaintiff has no cause of action.  Levesque
v. Wilkens, 57 S.W.3d 499, 503 (Tex. App.CHouston
[14th Dist.] 2001, no pet.).  Traditional
summary judgment for a defendant is proper only when the defendant negates at
least one element of each of the plaintiff=s
theories of recovery, or pleads and conclusively establishes each element of an
affirmative defense.  Sci. Spectrum,
Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).

In reviewing a traditional motion
for summary judgment, we take as true all evidence favorable to the nonmovant,
and we make all reasonable inferences in the nonmovant=s
favor.  Dolcefino v. Randolph, 19
S.W.3d 906, 916 (Tex. App.CHouston
[14th Dist.] 2000, pet. denied).  If the
movant=s motion
and summary-judgment evidence facially establish its right to judgment as a
matter of law, the burden shifts to the nonmovant to raise a genuine material
fact issue sufficient to defeat summary judgment.  Id.








In reviewing a no-evidence motion
for summary judgment, we ascertain whether the nonmovant pointed out
summary-judgment evidence of probative force to raise a genuine issue of fact
as to the essential elements attacked in the no-evidence motion.  Id., Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 206B08 (Tex.
2002).  We take as true all evidence
favorable to the nonmovant, and we draw all reasonable inferences from the
evidence in the nonmovant=s
favor.  Dolcefino, 19 S.W.3d at
916.  A trial court must grant a
no-evidence summary judgment if the party opposing the motion does not respond
with competent summary-judgment evidence that raises a genuine issue of
material fact.

We will sustain the trial court=s
judgment if (1) there is a complete absence of proof of a vital fact; (2) rules
of law or evidence bar the court from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital fact
is no more than a scintilla; or (4) the evidence conclusively establishes the
opposite of a vital fact.  Id.  More than a scintilla of evidence exists when
the evidence rises to a level that would enable reasonable and fair‑minded
people to differ in their conclusions.  Baty
v. Protech Ins. Agency, 63 S.W.3d 841, 847 (Tex. App.CHouston
[14th Dist.] 2001, pet. denied).  
Less than a scintilla of evidence exists when the evidence offered to prove
a vital fact is so weak it does no more than create a mere surmise or suspicion
of its existence, and in legal effect is no evidence.  Coastal Conduit & Ditching v. Naram
Energy Corp., 29 S.W.3d 282, 284B85 (Tex.
App.CHouston
[14th Dist.] 2000, no pet).

We review a summary judgment de
novo.  Provident Life and Accident
Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003).  If, as here, the trial court grants a motion
for summary judgment without stating the grounds on which it relied, we must
affirm the summary judgment if any ground argued in the motion is
sufficient.  Carr v. Brasher, 776
S.W.2d 567, 569 (Tex. 1989).  Thus, if
the Lundstroms fail to negate each ground on which the judgment may have been
rendered for any given claim, we must uphold the summary judgment as to that
claim.  See State Farm Fire & Cas.
Co. v. S.S. & G.W., 858 S.W.2d 374, 381 (Tex. 1993).  In the following analysis we therefore
consider each of the Lundstroms claims in relation to the summary judgment ground
or grounds USAA asserted in relation to that claim.








III.  Analysis

A.        Is Summary Judgment Proper on the Lundstroms= Breach
of Contract Claim?

1.         What claim, loss, and damage are
in question?

In order to review the propriety
of the summary judgment against the Lundstroms on their breach of contract
cause of action, we must first determine what specific Aclaims@ the Lundstroms
contend USAA wrongly denied, i.e., what Alosses@ they
contend USAA wrongly refused to cover. 
In their pleadings, their response to USAA=s motion
for summary judgment, and their brief in this court, the Lundstroms refer
variously to water damage from sprinkler system leaks, a blocked scupper and
downspout, and water entering through a hole in a fourth floor patio/roof.

The summary judgment proof shows
the Lundstroms experienced water intrusions beginning in July or August of
1998.  In February 1999, they informed
the builder they were experiencing continued leaks and a damp musty odor.  They also informed the builder they had
experienced water damage in the master closet in July 1999, when workers had
failed to cover the roof during construction. 
In late May 2000, during a heavy storm, water allegedly poured into the
Lundstroms= townhome through a hole in the
roof left by the builder=s
workers.  The parties agree the
Lundstroms did not inform USAA of any claim until May 2000.[9]








As a ground for traditional
summary judgment, USAA asserted the Lundstroms had failed to comply with the
provision of their policy requiring them, Aafter
loss,@ to Agive
prompt written notice to [USAA] of the facts relating to the claim.@  As proof of non-compliance, USAA referred to
the Lundstroms= Ahistory
of water damage in the Townhouse@ dating
from 1998.

The Lundstroms responded that the
1998 leak was minor and they did not believe it was covered.  They further stated, AIt was
not until April or May 2000 that it was determined that water damage and mold
contamination behind the walls of the structure had severely damaged the
residence.  Within one month after the
discovery of the damage, the Lundstroms notified USAA of the claim.@

In their appellate brief, the
Lundstroms argue, AThe
evidence showed the Lundstroms experienced some minor water damage between 1998
and May of 2000 . . . . In April or May of 2000 significant water damage
occurred after the builder attempted to repair portions of the fourth floor
balcony.@  Nevertheless, regarding coverage issues, the
Lundstroms argue, in part, their losses are covered under the provision for
accidental discharge from within a plumbing system.  They further argue the sprinkler system and
the roof drains and scuppersCwhich the
summary judgment proof shows are not in the same area of the townhouse as the
fourth floor balconyCare part
of the Aplumbing
system.@ 

In its appellate brief, USAA
places significant reliance on its summary judgment ground of untimely
notice.  In response, counsel for the
Lundstroms stated at oral argument, AThis is a
water damage case.@  He clarified that the water intrusion at
issue occurred during a rainstorm in May 2000, when water entered the house
through a hole in the roof.[10]  He further represented all water intrusions
before the May 2000 rainstorm were Ainconsequential@ and
therefore there was no need to notify USAA of those intrusions.[11]








Accordingly, we construe the
Lundstroms= Aclaim@ as being
for the Aloss@ that
resulted from the May 2000 rainstorm, when rain entered through a hole in the
patio/roof, and not for losses resulting from water intrusions caused by the
sprinkler system or the blocked scupper and downspout.  See Tourneau Houston, Inc. v. Harris County
Appraisal Dist., 24 S.W.3d 907, 909 (Tex. App.CHouston
[1st Dist.] 2000, no pet.) (citing Bates v. Dallas Indep. Sch. Dist.,
952 S.W.2d 543, 550 (Tex. App.CDallas
1997, writ denied), for proposition that appellate court may refuse to consider
issue conceded by party at oral argument). 
We therefore analyze the propriety of the summary judgment in relation
to the claim for loss from the May 2000 water intrusion through the hole in the
patio/roof.

2.         Did USAA Breach the Insurance Contract
in Relation to the Loss from the May 2000 Water Intrusion?

 

a.         Was the Covered Portion of the
Lundstroms= Claim Properly Resolved
by Binding Appraisal?

 

As a ground for summary judgment,
USAA asserted the covered portion of the Lundstroms= claim
had been resolved by binding appraisal. 
The policy contains the following provision:








Appraisal.  If you and we fail to agree on the actual
cash value, amount of loss or the cost of repair or replacement, either can
make a written demand for appraisal. 
Each will then select a competent, independent appraiser and notify the other
of the appraiser=s identity within 20 days
of receipt of the written demand.  The
two appraisers will choose an umpire.  If
they cannot agree upon an umpire within 15 days, you or we may request that the
choice be made by a judge of a district court of a judicial district where the
loss occurred.  The two appraisers will
then set the amount of loss, stating separately the actual cash value and loss
to each item.  If you or we request that
they do so, the appraisers will also set:

a.         the full replacement cost of the
dwelling.

b.         the full replacement
cost of any other building upon which loss is claimed.

c.         the full cost of repair
or replacement of loss to such building, without deduction for depreciation.

 

If the appraisers fail to
agree, they will submit their differences to the umpire.  An itemized decision agreed to by any two of
these three and filed with us will set the amount of the loss.  Such award shall be binding on you and us.

Each party will pay its
own appraiser and bear the other expenses of the appraisal and umpire equally.

 

USAA twice notified the
Lundstroms it intended to invoke the appraisal process to  Aidentify,
and rule on, damages caused to the interior of [the Lundstroms=] home
from the initial wetting.@  The notifications also informed the
Lundstroms, AThe Appraisal process will not
address damages involving the ongoing leaking or mold that has resulted.  This is a coverage issue, which we have
discusse[d] and denied.  It is the duty
of the Appraisers to address property damages and not address policy conditions
or coverage.@ 
The Lundstroms declined to participate in the appraisal process.  On September 23, 2002, the appraisal umpire
awarded $4,226.19 as the total amount of loss for the Ainitial
wetting (water).@








Appraisal awards made under the
provisions of an insurance contract are binding and enforceable, and a court
will indulge every reasonable presumption to sustain an appraisal award.  See Franco v. Slavonic Mut. Fire Ins.,
154 S.W.3d 777, 786 (Tex. App.CHouston
[14th Dist] 2004, no pet.).  The effect
of an appraisal provision is to estop one party from contesting the issue of
damages in a suit on the insurance contract, leaving only the question of
liability for the court.  Id.  Because a court indulges every reasonable
presumption to sustain an appraisal award, the burden of proof is on the party
seeking to avoid the award.  Id. There
are, however, three situations in which the results of an otherwise binding
appraisal may be disregarded: (1) when the award was made without authority;
(2) when the award was made as a result of fraud, accident, or mistake; or (3)
when the award was not in compliance with the requirements of the policy.  Id.

The Lundstroms contend the umpire=s award
is void for lack of authority because the appraisal clause can be invoked only
when the scope of damage is agreed and not when coverage or causation is
disputed.  In support, they cite Wells
v. American States Preferred Insurance Co., 919 S.W.2d 679 (Tex. App.CDallas
1996, writ denied).  Wells is
distinguishable and we decline to read Wells as broadly as the Lundstroms
would have us do.

In Wells, after the
insureds= home
sustained damage from foundation movement, the insureds investigated and
discovered a leak in the plumbing system under the foundation.  Id. at 681.  A structural engineer inspected the property
and reported that the plumbing leak caused the foundation movement.  Id. 
The insureds then made a claim on their homeowners policy.  Id. 
The insurance company=s
adjuster inspected the property and opined the sewer-line leak did not cause
the damage.  Id.  The insurance company=s own
inspector also concluded the plumbing leak did not cause the foundation
movement, and the insurance company subsequently denied the claim.  Id. 
At the same time, the insurance company demanded an appraisal under an
appraisal provision identical to the one in the present case.  See id.

Both appraisers and the umpire
unanimously determined that the insureds= home had
resulting damage in the amount of $22,875.94 to the dwelling due to foundation
movement.  Id. at 682.  However, the insurance company=s
appraiser and the umpire determined damage to the dwelling related to the
plumbing leak was zero.  Id.  The appraisal award contained the following
recital:








Damage to dwelling related
to plumbing leak.  

Loss Replacement Cost ‑0‑

Loss Actual Cash Value ‑0‑

.    .   
.    .    .

CLARIFICATIONS IF
ANY:  Resulting damage to dwelling due to
foundation movement $22,875.94

Id. at 683.

The insurance company filed a
motion for summary judgment based on the determination the plumbing leak did
not cause the claimed loss.  Id.
at 682.  The insureds filed their own
motion for partial summary judgment based on the unanimous determination of the
appraisers and umpire that the amount of loss to the dwelling resulting from
foundation movement was $22,875.94.  Id.  The trial court granted the insurance company=s motion,
denied the insureds= motion,
and rendered a take‑nothing summary judgment against the insureds.  Id.

The court of appeals
reversed.  After examining case law from
other jurisdictions and considering the language of the appraisal provision,
the court concluded the appraisal panel=s
authority was limited to determining the amount of loss:

We conclude that the
authority of the appraisal panel in the present case was limited to determining
only the amount of loss.  Therefore, we
conclude further that the appraisal section of the policy, as a matter of law,
did not authorize and empower the appraisal panel to determine that the
plumbing leak did not cause the loss to the [insureds=] property.  It follows, and we so hold, that the
appraisal section of the Texas Homeowner=s Policy quoted above
establishes an appraisal procedure to determine the dollar amount of the
insured's loss only, and that it does not authorize or empower the appraisal
panel created thereunder to determine what caused or did not cause that
loss.  Indeed, we hold that, absent an
agreement to the contrary, questions of what caused or did not cause the loss
are questions to be decided by the court. 
Moreover, we hold that participation by the insured in the appraisal
process does not constitute agreement by the insured to authorize and empower
the appraisal panel to determine questions of what caused or did not cause the
loss.








In the present case, we
conclude that the one appraiser and the umpire exceeded their authority when
they determined that the plumbing leak did not cause the [insureds=] loss.  It follows, and we so hold, that the trial
court erred in finding that American States is entitled to a declaratory
summary judgment maturing the appraisal award in the present case and entering
a take‑nothing summary judgment against the [insureds] based upon that
determination.

 

Id. at 685.

Unlike Wells, there were
no coverage issues before the umpire and appraiser in the present case.  Instead, USAA agreed to cover the loss
occurring at the time of the initial water intrusion and requested that the
appraisers determine the amount of that loss. 
Also, unlike Wells, the appraisal (umpire=s) award
does not partition a  loss among various
causes.  Finally, although USAA, in its
letters invoking the right to an appraisal, referred to Adamages
caused . . . from the initial wetting,@ it is
clear from the context that USAA was referring to damages in existence at a
point in time and distinguishing those damages from damages occurring
subsequently.








To the extent the Lundstroms
would have us read Wells to mean appraisers exceed the scope of their
authority whenever causation factors into the award, we decline to do so.  The cases cited in Wells stand for the
narrower proposition that appraisers exceed their authority when they engage in
making the legal determination of what is or is not a covered loss based on
their determination of what caused the loss or a portion of it.  See, e.g., Wausau Ins. Co.
v. Herbert Halperin Dist. Corp., 664 F. Supp. 987, 989 (D. Md. 1987)
(observing that insurance company was not Afactually
disputing the consequences of the occurrence,@ but
contesting the issue of legal causation on basis that policy exclusions applied
to limit scope of coverage, i.e., the issue was one of contract
interpretation and for the court, not the appraiser to resolve); Munn v. Nat=l Fire
Ins. Co. of Hartford, 115 So. 2d 54, 56, 57 ( Miss. 1959) (stating
finding of appraisers on question of coverage would be question of law and not
final; and observing, if storm caused damage, insurance companies would be
liable, but if other force or agency than those listed in policy caused damage
insurance companies not liable); see also CIGNA Ins. Co. v. Didimoi Prop. Holdings,
N.V., 110 F. Supp. 2d 259, 265, 267, 268 (D. Del. 2000) (faulting parties
for confusing Aamount of loss,@ and Acoverage,@ and
concluding, under circumstances of case, determination of amount of loss under
appraisal clause included determination of causation).[12]

b.         Is Loss Caused by Mold Covered under
the Lundstroms= Homeowners Policy?

 

As a separate ground for
traditional summary judgment, USAA contended the Lundstroms=
homeowners policy excluded coverage for their loss.  The Lundstroms= policy
contained the following coverage provisions:

SECTION I - PERILS INSURED
AGAINST

COVERAGE A (DWELLING)

We insure against all risk of
physical loss to the property described in Section I Property Coverage,
Coverage A (Dwelling) unless the loss is excluded in Section I Exclusions.           

COVERAGE B (PERSONAL PROPERTY)

We insure against physical loss to
the property described in Section I Property Coverage, Coverage B (Personal
Property) caused by a peril listed below, unless the loss is excluded in
Section I Exclusions.

. . . .

9.         Accidental Discharge, Leakage or Overflow of Water of
Steam from within a plumbing, heating or air conditioning system or
household appliance.

A loss resulting from this peril includes the cost of
tearing out and replacing any part of the building necessary to repair or
replace the system or appliance.  But
this does not include loss to the system or appliance from which the water or
steam escaped.

Exclusions 1.a. through 1.h. under Section I
Exclusions do not apply to loss caused by this peril.








SECTION I -
EXCLUSIONS

 

1.         The following exclusions apply to loss to property described
under Coverage A (Dwelling) or Coverage B (Personal Property), but they do not
apply to an ensuing loss caused by fire, smoke or explosion.

. . . .     

f.          We do not cover loss caused by:

(1)       wear and tear, deterioration or loss caused by any quality in
property that causes it to damage or destroy itself.

(2)       rust, rot, mold or other fungi.

. . . .     

We do cover ensuing loss caused by collapse of
building or any part of the building, water damage or breakage of glass which
is part of the building if the loss would otherwise be covered under this
policy.

 

In its summary judgment motion,
USAA cited the paragraph f(1) exclusion and argued, ATherefore,
the fact that the Townhouse contained numerous building defects that allowed
water to penetrate the home bars coverage for any damages resulting from the
same.@  USAA also referred to the umpire=s award
discussed above and argued the only portion of the claim that was covered had
been permanently resolved.  Finally, USAA
argued the Lundstroms= mold
claims were expressly excluded under paragraph f(2).  In their response, the Lundstroms
acknowledged the policy exclusions for building defects and mold, but invoked
the ensuing loss provision of paragraph f.








Under paragraph f(2) of the
policy, USAA specifically excludes from coverage Aloss
caused by . . . mold or other fungi.@  As an exception to the exclusion, however,
USAA does Acover ensuing loss caused by . .
. water damage.@  The question is whether the alleged mold
damage in the present case is covered under the ensuing loss exception to the
mold exclusion.[13]

In construing an insurance
contract, we apply the same rules we apply to the construction of other
contracts.  Balandran v. Safeco Ins.
Co. of Am., 972 S.W.2d 738, 740B41 (Tex.
1998).  Our primary goal is to give
effect to the written expression of the parties=
intent.  Id. at 741.  We must read the contract as a whole, Astriving
to give meaning to every sentence, clause, and word to avoid rendering any
portion inoperative.@  Id. 
Nevertheless, when, as here, the policy forms are mandated by a state
regulatory agency, the actual intent of the parties is not material.  Progressive County Mut. Ins. Co. v. Sink,
107 S.W.3d 547, 551 (Tex. 2003). 
Instead, we are to determine the ordinary, everyday meaning of the words
to the general public.  Id.  Our inquiry is, A>first, an
effort to determine the ordinary lay meaning of the words to the general
public, and, in light of this meaning, it is, second, an examination of the
choice the purchaser had and the choice he made.=@ Id.
at 552 (quoting U.S. Ins. Co. of Waco v. Boyer, 153 Tex. 415, 418, 269
S.W.2d 340, 341 (1954)).








When an ambiguity involves an
exclusionary provision of an insurance policy, a court A>must
adopt the construction . . . urged by the insured as long as that construction
is not unreasonable, even if the construction urged by the insurer appears to
be more reasonable or a more accurate reflection of the parties= intent.=@  Balandran, 972 S.W.2d at 741 (quoting Nat=l Union
Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811
S.W.2d 552, 555 (Tex. 1991)). 
Nevertheless, courts construe a policy exclusion against the insurer in
favor of coverage only when construing an ambiguous policy provision.  Am. States Ins. Co. v. Bailey, 133
F.3d 363, 369 (5th Cir. 1998); see also Comsys Info. Tech. Servs., Inc. v.
Twin City Fire Ins. Co., 130 S.W.3d 181, 194 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied) (stating courts employ doctrine of construing
contract term against insurer in favor of coverage, only when construing an
ambiguous policy provision).

If a court can give a contract
only one reasonable meaning, the contract is not ambiguous and the court will
enforce it as written.  State Farm
Fire & Cas. Co. v. Vaughan, 968 S.W.2d 931, 933 (Tex. 1998).  In contrast, if a contract is susceptible to
two or more reasonable interpretations, it is ambiguous.  Kelley‑Coppedge, Inc. v. Highlands
Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998). 
Whether a contract is ambiguous is a question of law for the court to
decide by examining the entire contract in light of the existing circumstances
at the time the contract was entered.  Id.

The San Antonio Court of Appeals
has explained: ATo >ensue= means >to follow
as a consequence or in chronological succession; to result, as an ensuing
conclusion or effect.=  An >ensuing
loss,= then, is
a loss which follows as a consequence of some preceding event or circumstance.@  Lambros v. Standard Fire Ins. Co., 530
S.W.2d 138, 141 (Tex. Civ. App.CSan
Antonio 1975, writ ref=d)
(quoting Webster=s New Int=l
Dictionary 852 (2d ed., unabridged, 1959), and citing McKool v. Reliance Ins.
Co., 386 S.W.2d 344, 345 (Tex. Civ. App.CDallas
1965, writ dism=d)).








In Lambros, the court
considered facts and policy provisions paralleling those in the present case.  The insureds in Lambros alleged that
damage to their home had been caused by underground water exerting pressure on,
or leaking through, various parts of the home. 
Id. at 139.  In addition,
they alleged loss caused by, and resulting from, Asettling,
cracking, bulging, shrinkage, expansion of foundations, walls, floors,
ceilings, roof structures.@  Id. 
Underground water was an insured risk because the insureds had paid to
have the exclusion for loss from underground water deleted from their
policy.  See id. at 140B41.  The policy, however, contained an exclusion,
exclusion k, for A>Loss . .
. caused by settling, cracking, bulging, shrinkage, or expansion of
foundations, walls, floors, ceilings, roof structures . . . .=@ Id.
at 139.  A jury found the insureds= loss was
caused by water below the surface of the ground and also by settling, cracking,
etc.  Id. at 140.

Of particular relevance to the
present case is the San Antonio court=s
analysis of whether the ensuing loss exception to exclusion k, rendered that
exclusion inapplicable.  The ensuing loss
exception provided:

AThe foregoing Exclusions a
through k shall not apply to ensuing loss caused by fire, smoke or explosion
and Exclusions i, j and k shall not apply to ensuing loss caused by collapse of
building, or any part thereof, water damage . . ., provided such losses would
otherwise be covered under this policy.@

 

Id. at 139.

The San Antonio court declined to
apply the ensuing loss exception to the settling exclusion.  The court assumed the insureds= loss
resulted from the action or presence of water beneath the surface, but
reasoned:








[I]t nevertheless cannot
be contended that such loss was an Aensuing loss@ caused by water
damage.  Such a conclusion would involve Aa backward application of
the ensuing loss exception.@  Such a
construction, in effect, reads Aensuing@ out of the
exception.  If we give to the language of
the exception its ordinary meaning, we must conclude that an ensuing loss
caused by water damage is a loss caused by water damage where the water damage
itself is the result of a preceding cause. 
What is the preceding cause which gives to the exception the effect of
taking the ensuing loss out of the reach of exception k?  Again, the plain language of the
exception compels the conclusion that the water damage must be a consequence,
i.e., follow from or be the result of the types of damage enumerated in
exception k.  AEnsuing loss caused by
water damage@ refers to water damage
which is the result, rather than the cause, of Asettling, cracking,
bulging, shrinkage, or expansion of foundations, walls, floors, ceilings. . . .@  Since the evidence in this case, even when
viewed in the light most favorable to plaintiffs, conclusively establishes that
water damage was the cause, rather than the consequence, of settling, etc.,
exclusion k is applicable.

 

Id. at 141B42
(emphasis added) (quoting Larry L. Gollaher, The 1960 Texas Standard
Homeowners Policy, 24 Sw.
L.J. 636, 651 (1970), and citing Park v. Hanover Ins. Co., 443 S.W.2d
940, 942 (Tex. Civ. App.CAmarillo
1969, no writ)).

Lambros,
therefore, rests on the premise that the Aensuing
loss@ is to be
understood as a loss that results or follows from the listed excluded risks
(wear and tear, deterioration, inherent vice, rust, rot, mold, etc.).  See Coury v. Allstate Lloyd=s, No.
H-02-2238, 2004 WL 343946, at *4 (S.D. Tex. Jan. 6, 2004) (magistrate=s
memorandum and recommendation) (placing Lambros among cases
understanding Aensuing loss@ to mean
losses which ensue from excluded event).

Assuming, without deciding, that
rainwater entering through a hole cut by a third party is a covered risk under
the Lundstroms= policy, that risk parallels the
underground water risk in Lambros.[14]  The mold exclusion in the Lundstroms= policy
parallels the settling exclusion in Lambros.  Consistent with Lambros, for the
ensuing loss exception to override the exclusion for mold in the present case,
the mold must have caused or preceded the water damage, not vice versa.  Because the Texas Supreme Court refused writ
in Lambros, the opinion in that case has the same precedential value as
an opinion of the Supreme Court.  Tex. R. App. P. 56.1. The Lundstroms
point to no published, post-Lambros, case from Texas holding otherwise,
and we have found none.








Courts and commentators cite only
three Texas cases as supporting the conclusion that mold damage is covered
under the ensuing loss exception:  Allstate
Insurance  Co. v. Smith, 450 S.W.2d
957 (Tex. Civ. App.CWaco 1970,
no writ); Employers Casualty Co. v. Holm, 393 S.W.2d 363 (Tex. Civ. App.CHouston
1965, no writ); and Home Insurance Co. v. McClain, No. 05-97-01479-CV,
2000 WL 144115 (Tex. App.CDallas
Feb. 10, 2000, no pet.) (not designated for publication).  See Fiess v. State Farm Lloyds, 392
F.3d 802, 809 n.28 (citing cases); Coury, 2004 WL 343946, at *4 (same);
William J. Chriss, Coverage for Ensuing Water Damage under Texas Property
Insurance Policies, 46 S. Tex. L.
Rev. 1247, 1265 nn. 58, 59 (2005) (same).  Smith and Holm pre-date Lambros.

McClain, an
unpublished case, is factually very similar to the present case.  In McClain, rainwater entered the
insureds=
residence through leaks in a new roof of an addition, as well as leaks in the
roof on the previously existing part of the house.  2000 WL 144115, at *1.  The insureds sued the builder alleging the
builder=s work
was defective and caused problems in various parts of the house.  Id. 
The insureds subsequently discovered the leaking water had collected and
soaked the stud areas behind the interior walls, damaging the walls, ceilings
and subfloors.  Id.  According to the appellate court, AThe
rainwater provided an environment for mold and bacteria to grow.@  Id.

The insureds eventually settled
with the builder, but the settlement did not reflect any  recovery for environmental remediation,
move-out, hotel, or rental expenses; and the builder went out of business sixty
days after the lawsuit settled.  Id.  The insureds then filed a claim with the
insurer to recover their remaining covered damages.  The insurer denied the claim based, in part,
on the mold exclusion.  Id.  The insureds then sued the insurer to obtain
coverage.  Id.  The trial court granted partial summary
judgment for the insureds on the issue of the mold exclusion, and the court of
appeals affirmed that part of the final judgment.  Id. at *2, *4.

The court of appeals rejected the
insurer=s
contention that the ensuing loss provision covered only water damage which
follows or results from mold or fungus damage and does not cover mold and
fungus, even if caused by water damage.  Id.
at *3.  The court faulted the insurer=s
position:








Home [the insurer] ignores
that the ensuing-loss provision is not limited by the mold and fungi exclusion,
and, although the water damage was not the result of the mold and fungi, it was
the result of the defective and deteriorated roof.  Thus, the application of the mold and fungi
exclusion is dependent on the application of the ensuing-loss provision.

AEnsuing losses@ mean losses which follow
or come afterward as a consequence.  See
McKool v. Reliance Ins. Co., 386 S.W.2d 344, 345 (Tex. Civ. App.CDallas 1965, writ dism=d).  To be an ensuing loss caused by water
damage, the mold and fungi would necessarily have to follow or come afterward
as a consequence of the water damage. . . .

Here, the water from the
leaking roof pooling in the crawl spaces caused the mold and fungi.  The facts are uncontroverted that the damages
claimed were a consequence of water leaking from the roof.  Both the McClains [insureds] and Home [the
insurer] acknowledged these facts in their pleadings, motions for summary
judgments, and appellate briefs.  Home
does not claim the mold and fungi came from another source.  Consequently, the loss that followed the
water damage was caused by water damage. 
Therefore, under the facts of this case, the exclusion for fungi and
mold damage does not apply.

 

Id. at *3B4
(emphasis added).

Contrary to Lambros, the McClain
court construed Aensuing
loss@ as
meaning to follow an event listed in the ensuing loss provision (water damage)
rather than to follow events listed in the exclusions.  See Coury, 2004 WL 343946, at *4
(placing McClain among cases understanding Aensuing
loss@ to mean
losses which ensue from events listed in ensuing loss provision).  The McClain court also relied heavily
on Holm, a pre-Lambros case.








In the only published post-Lambros
case, Zeidan v. State Farm Fire & Casualty Co., the court followed Lambros.  960 S.W.2d 663, 666 (Tex. App.CEl Paso
1997, no writ).  The insured in Zeiden
argued that, as a result of rainstorms, there was a shift in the soil under his
residence, and this shift, along with other causes, damaged his residence by
collapsing the wall and causing structural damage.  Id. at 665B66.  The El Paso court concluded the insured=s
reliance on the ensuing loss paragraph was Amisplaced
because the water damage referred to could not imply the rain water [the
insured] claims damaged his residence.@  Id. at 666.

Regardless of whether we agree
with Lambros, it is on point, and as an intermediate court of appeals,
this court is bound to follow established precedent from the Texas Supreme
Court.  Consideration of any changes to
common-law rules must be left to that higher authority.  Lubbock County, Tex. V. Trammel=s Lubbock
Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002).[15]  Under Lambros, the mold damage, which
followed rather than preceded the water damage in the present case, is excluded
from coverage under the Lundstroms=
policy.  Under the umpire=s award,
discussed above, the Lundstroms were compensated for their covered loss.

We therefore overrule the
Lundstroms= issues three, four, and eight,
by which they challenge the effect of the umpire=s award
and USAA=s
interpretation of the ensuing loss exception to the mold exclusion.[16]  Accordingly, we affirm the summary judgment
against the Lundstroms on their breach of contract claims.








B.        Is Summary Judgment Proper on the Lundstroms=
Bad-Faith Claims?

In addition to their contractual
claims, the Lundstroms asserted claims for violation of the duty of good faith
and fair dealing (Abad faith@),
violation of the DTPA,[17]
and unfair insurance practices.[18]  In its summary judgment motion, USAA argued
that each of these claims was barred as a matter of law because a good faith
dispute existed regarding coverage. USAA specifically referred to a dispute
over whether any of the damage was caused by plumbing leaks and observed the
Lundstroms were entitled to coverage only if accidental discharge, leakage or
overflow of water from within a plumbing, heating or air conditioning system or
from a domestic appliance caused the damage. 
In addition, USAA moved for summary judgment on no evidence grounds on
each of these claims.  With regard to the
bad faith claim, USAA argued, in part, there was Ano
evidence to support a claim that USAA denied or delayed payment of a claim at a
time when its liability was reasonably clear.@

In response, the Lundstroms
argued the question of bad faith was a question of fact, not law.  The only statements in the Lundstroms= response
that even arguably approach factual allegations, however, are the following:
(1) USAA=s own
engineer found damage was caused by leaking plumbing systems, but USAA Astood by
its denial of the toxic mold damage@; and (2)
when presented with conflicting engineering reports, USAA had the opportunity
to have another independent engineer evaluate the residence, but failed to do
so.[19]  The Lundstroms also claimed the bona fide
dispute rule was inapplicable because USAA accepted coverage and made partial
payment.








On appeal, the Lundstroms argue
USAA Adecided
the claim was not covered because building defects caused the loss, and no
plumbing leak related to the loss.  It
[USAA] concluded >any
related mold damage= is not
covered.@  The Lundstroms also point to HDR=s report,
which identified problems with the sprinkler system and with the scupper and
downspout.  The Lundstroms suggest USAA
wrongly denied the claim Awhen its
own report show[ed] coverage, the insured point[ed] this fact out in writing,
and no plausible reason [was] articulated to support the insurer=s
conclusion of >no coverage.=@

USAA=s written
notice denying the claim is not part of the summary judgment proof.  Moreover, as discussed in Part III.A.l.,
above, in an apparent attempt to avoid USAA=s charge
of untimely notice, the Lundstroms have narrowed their claim to one for the
loss resulting from the May 2000 rainstorm.[20]  That loss involved alleged damage from the
initial water intrusion through the hole in the fourth floor patio/roof and the
subsequent development of mold.  Pursuant
to the appraisal process, USAA paid the Lundstroms for damage occurring during
the initial water intrusion; USAA disputed coverage for mold damage.








An insurer breaches its duty of
good faith and fair dealing by denying or delaying payment of a claim if the
insurer knew or should have known it was reasonably clear the claim was
covered.  Universe Life Ins. Co. v.
Giles, 950 S.W.2d 48, 49 (Tex. 1997). 
Conversely, there can be no claim for bad faith when an insurer has
denied a claim that is, in fact, not covered and has not otherwise breached the
contract.  Betco Scaffolds Co. v.
Houston United Cas. Ins. Co., 29 S.W.3d 341, 348 (Tex. App.CHouston
[14th Dist.] 2000, no pet.); accord Tivoli Corp. v. Jewelers Mut. Ins. Co.,
932 S.W.2d 704, 712 (Tex. App.CSan
Antonio 1996, writ denied) (holding extra‑contractual claims fail when
denial of a claim is held to be appropriate). 
However, this principle does not exclude the possibility that, in
denying the claim, the insurer may have committed an act so extreme as to cause
injury independent of the policy claim.  Betco
Scaffolds Co., 29 S.W.3d at 348.  It
also does not change established principles regarding the duty of an insurer to
timely investigate its insureds=
claims.  Id.

In Part III.A.2.b., above, we
held that the Lundstroms= policy
did not cover mold damage under the facts alleged here.  The Lundstroms have not alleged any act so
extreme as to cause an injury independent of USAA=s denial
of their policy claim.  Accordingly, the
Lundstroms= bad faith claim fails as a
matter of law.

Based on our review of the
Lundstroms= pleadings and summary judgment
arguments, we conclude their DTPA and unfair insurance practices claims arose
from the same underlying theory as did their bad faith claim: USAA allegedly
denied or delayed paying benefits under the policy when, based on its
investigation, its liability allegedly was reasonably clear.  In conclusively disproving the bad faith
claim, USAA therefore also conclusively disproved those claims.  See State Farm Fire & Cas. Co. v.
Woods, 925 F. Supp. 1174, 1180 (E.D. Tex. 1996), aff=d, 129
F.3d 607 (5th Cir. 1997); see also Carter v. State Farm Mut. Auto. Ins. Co.,
33 S.W.3d 369, 373 (Tex. App.CFort
Worth 2000, no pet.) (stating, when claims under DTPA and Insurance Code do
nothing more than recharacterize a bad faith claim, defense to the bad faith
claim serves to defeat statutory claims).

We overrule the Lundstroms= issues
five and six, by which they challenge the summary judgment against them on
their claims for violation of the duty of good faith and fair dealing (Abad faith@),
violation of the Deceptive Trade Practices Act (DTPA), and unfair insurance
practices.  Accordingly, we affirm the
summary judgment against the Lundstroms on those claims.








C.        Is Summary Judgment
Proper on the Lundstroms= Claim under Former
Article 21.55? 

 

Finally, the Lundstroms contend
the trial court erroneously granted summary judgment against them on their
claim under former Insurance Code article 21.55, relating to prompt payment of
claims.[21]  In their petition, the Lundstroms alleged
USAA violated article 21.55 by (1) failing, within fifteen days after receipt
of notice of the Lundstroms= water
loss claim, to request any items, statements, and forms reasonably believed to
be required, (2) failing, within thirty-six days after receipt of notice of the
claim, to accept or reject the claim in writing, and (3) failing, within
sixty-days after receipt of notice of the claim, to pay the claim.[22]

USAA moved only for no-evidence
summary judgment on the Lundstroms= article
21.55 claim.  After setting forth the
elements of an article 21.55 claim, USAA stated, ABecause
Plaintiffs cannot establish that the claim at issue is a claim for which USAA
is liable, Plaintiffs have not and cannot demonstrate that USAA is liable for
violating Article 21.55.@[23]  USAA also argued, APlaintiffs
have not and cannot establish or put forth any evidence that USAA violated any
subpart of Article 21.55.@[24]








In their response, the Lundstroms
recited the article 21.55 provisions and related case law.  They did not, however, direct the trial court
to any summary judgment proof in support of their article 21.55 claim.

On appeal, the Lundstroms allege:  AThe
evidence shows the Lundstroms notified USAA of the loss in May of 2000, and it
was not until April 11, 2001, that USAA=s agent,
HDR Engineering, Inc., commenced its investigation of the premises.@  They further allege, AAfter the
HDR report issued, and a year and two months after the loss, USAA improperly
denied the claim on July 17, 2001.@  In support of both allegations, the
Lundstroms cite only Vonnie Lundstrom=s October
26, 2001 letter to USAA in which she states:

Your letter dated July 17,
2001 states A[o]ur investigation of the
damages concluded that building defects or practices of your builder caused the
damages to your home.@  The letter further states:  A[s]ince there was no
plumbing leak related to this loss, your policy does not cover any related mold
damages originating from the construction of the building.@  USAA=s analysis is incorrect,
and neither of these statements provides any basis for denial of our claim.

To recap the history of
this claim, which was initially reported approximately a year and a half ago,
in May 2000, I refer you to my April 10, 2001 letter which is attached hereto
as Exhibit AA.@  Commencing on April 11, 2001, HDR Engineering
conducted a series of inspections of the townhome at USAA=s direction.  Over two months later, on June 21, 2001, HDR
submitted the report of its findings to USAA (Athe HDR Report@).  USAA=s denial letter was dated
July 17, 2001, 26 days after HDR=s June 21, 2001 report and
over three months since HDR first began its inspections.  The July 17, 2001 letter was the first and
only written indication, since this claim was made over a year earlier, that
USAA was denying coverage for any part of our claim.

 

The April 11, 2001 letter is not part of the
summary judgment proof.








Under Texas Rule of Civil
Procedure 166a(i), a trial court must grant a no‑evidence motion unless
the respondent produces summary judgment proof raising a fact issue.  Tex.
R. Civ. P. 166a(i).  The
respondents are not required to marshal their proof.  Tex.
R. Civ. P. 166a cmt. to 1997 change. 
Nevertheless, they must point out evidence raising a fact issue on the
challenged elements.  Id.

Although the Lundstroms attached
ten exhibits, comprising over 250 pages, to their response, they did not, in
their response, point to any evidence as raising a fact issue on their claim
under article 21.55.  On this basis
alone, we may hold the Lundstroms failed to meet the requirements of Rule
166a(i) for raising a fact issue.  See,
e.g.,Cmty. Initiatives, Inc. v. Chase Bank of Tex., 153 S.W.3d 270, 282
(Tex. App.CEl Paso 2004, no pet.) (stating,
in tortuous interference of contract case, failure to direct trial court to any
evidence of consideration for purported contract alone would support summary
judgment on this cause of action); see also Nicholson v. Naficy,
747 S.W.2d 3, 4 n.1 (Tex. App.CHouston
[1st Dist.] 1987, no writ) (refusing to consider portion of deposition attached
to motion for traditional summary judgment, but not cited, quoted, or otherwise
pointed out to trial court).

Even if we consider the summary
judgment proof cited in the Lundstroms=
appellate brief, however, we conclude it is insufficient to raise a fact issue
regarding a violation of article 21.55. 
Although Vonnie Lundstrom=s letter
refers to the alleged dates the Lundstroms notified USAA of their claim, the
dates of the inspection, and the date of the denial, the letter provides no
evidence that the claim at issue is a claim for which USAA is liable.  See Allstate Ins. Co. v. Bonner, 51
S.W.3d 289, 291 (Tex. 2001) (stating, to successfully maintain article 21.55
claim, party must establish insurer is liable for a claim under an insurance
policy).

We therefore overrule the
Lundstroms= issue seven, by which they
challenge the summary judgment against them on their claim under former Texas
Insurance Code article 21.55.  Accordingly
we affirm the judgment against the Lundstroms on that claim.

IV.  Conclusion








As stated, we have construed the
Lundstroms= claim as being for the loss that
resulted from the May 2000 rainstorm and conclude the Lundstroms timely gave
USAA notice of that claim.  Under Lambros,
we further conclude that any mold damage ensuing from that loss was not covered
by the Lundstroms=
homeowner=s policy and the amount of damage
occurring at the time of the initial May 2000 wetting was resolved in binding
arbitration.  We therefore hold the trial
court properly granted summary judgment in favor of USAA on the Lundstroms= breach
of contract claims.

We conclude the Lundstroms= bad
faith claim fails as a matter of law, and USAA also conclusively disproved the
Lundstroms= DTPA and unfair insurance
practices claim.  We further conclude the
Lundstroms failed to raise a fact issue regarding their alleged violation
of  article 21.55.  We therefore hold the trial court properly
granted summary judgment in favor of USAA on the Lundstroms=
bad-faith and article 21.55 claims.

We therefore overrule the
Lundstroms= issue one, by which they
challenge the summary judgment generally. 
Accordingly, we affirm the judgment of the trial court.

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed January 26, 2006.

Panel consists of Justices Edelman, Seymore, and Guzman.

 

 











[1]  They insured Aother structures@ for
$25,000.





[2]  A scupper is
an opening to allow water to drain off a floor or flat roof.  Webster=s Third Int=l Dictionary 2044 (1993).





[3]  Neither party
included a reservation of rights letter or a written denial of claim as part of
the summary judgment proof.  The July 17,
2001 date appears in a letter from Vonnie Lundstrom to USAA=s  Senior
Property Field Adjuster.





[4]  See Tex. Bus.
& Com. Code Ann. '' 17.41B.885 (Vernon 2002 & Supp.
2005).





[5]  See Act
of May 19, 1995, 74th Leg., R.S., ch 414, ' 11,
1995 Tex. Gen. Laws 2988, 2997B3000 (amended 1995, 2001) (repealed and recodified
2003) (current version at Tex. Ins. Code
Ann. ' 542.003 (Vernon Supp. 2005).





[6]  See Act
of May 27, 1991, 72nd Leg., R.S., ch 242, ' 11.03,
art. 21.55, 1991 Tex. Gen. Laws 939, 1043B45
(repealed and recodified 2003) (current version at Tex. Ins. Code Ann. ' 542.055
(Vernon Supp. 2005).  The Lundstroms also
alleged USAA waived, and was estopped from asserting, any defenses, conditions,
exclusions, or exceptions to coverage not contained in any reservation of
rights letter.  They did not allege what
those defenses, conditions, exclusions, or exceptions were.  The Lundstroms did not renew this argument in
their response to USAA=s motion for summary judgment or in their brief before
this court.





[7]  USAA also
invoked the Aone satisfaction rule@ and
claimed it was entitled to full credit paid to the Lundstoms in settlement of
the Baker lawsuit.





[8]  They list the
following sub-issue under issue two:  ADoes the >made
whole= doctrine encourage or require such litigation?  Ortiz v. Great Southern Fire and Casualty
Insurance Company, 597 S.W.2d 342, 343B44 (Tex.
1980).@  They list the
following two sub-issues under issue three: ADoes
some evidence show coverage under the >accidental
discharge= clause?  Does
some evidence show coverage under the Aensuing
loss@ clause?@





[9]  In their
original petition and first amended petition, the Lundstroms represented they
reported their loss Aon or about May 14, 2001.@  In a letter to
the USAA Senior Property Field Adjustor, however, Vonnie Lundstrom refers to
having first reported the Aclaim@ in AMay 2000.  The
May 2000 date is consistent with her deposition testimony.  At oral argument, both parties agreed the
Lundstroms reported their claim in May 2000.





[10]  According to
the summary judgment proof, on May 19, 2000, Bruce Lundstrom called the builder
to report it was raining and his roof was Aan open
wound.@  On May 20,
2000, he called to report Awater gushing into [his] house.@  Nevertheless,
at oral argument, counsel referred to the rainstorm as occurring AMay 21, 2001.@  Presumably he meant A2000.@  This
interpretation would be consistent with the parties= agreement at oral argument that the Lundstroms notified USAA of the
rainstorm loss in May 2000.





[11]  Alleged losses
from water intrusions predating the May 2000 rainstorm included losses related
to the sprinkler system and the blocked scupper and downspout, both of which
were located on the north side of the townhouse, an area in which the
Lundstroms stated they noticed water spotting as early as August 1998.  The Lundstroms= belief
that these losses were below their deductible would not necessarily excuse them
from timely notifying USAA of any facts related to claims for these
losses.  See Edwards v. Ranger Ins.
Co., 456 S.W.2d 419, 421 (Tex. Civ. App.CFort
Worth 1970, writ ref=d n. r. e.) (holding insured breached contract by
waiting forty-six days to give insured notice of the accident or occurrence out
of which his loss arose when insured=s excuse
for the delay was his belief the cost of repairing the damage would not exceed
the deductible amount).  Also, the
Lundstroms= statement that they first learned of mold damage in
2000 would not necessarily excuse them from timely reporting the earlier
leakage of which they were aware.  See
Hood v. State Farm Lloyds, No. Civ.A.H.-03-2612, 2004 WL 1490377, at *2
(S.D. Tex. May 17, 2004) (stating, because of consistent, obvious leaks in
roof, insured had duty to investigate for mold or other consequences); see
also Flores v. Allstate Tex. Lloyd=s
Co., 278 F. Supp. 2d 810, 816 (S.D.
Tex. 2003) (stating homeowner cannot sit back and watch mold grow in home or
observe obvious mold-instigating eventCsuch a
flooding or continuous leak that saturates surfaceCand not notify insurers, but holding, on facts before
it, that notice was timely).





[12]  The Lundstroms
contend the summary judgment proof showed USAA breached the contract on July
17, 2001, and they were not bound by the policy provisions after that
point.  As discussed in this section and
the following section, we conclude USAA did not breach the contract.





[13]  The
applicability of an exception to an exclusion is a question of coverage, on
which the insured has the burden of proof. 
Telepak v. United Servs.  Auto.
Ass=n, 887
S.W.2d 506, 506 (Tex. App.CSan Antonio 1994, writ denied); see Comsys Info.
Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 193 (Tex.
App.CHouston [14th Dist.] 2003, pet. denied) (discussing
insured=s initial burden of proving coverage, insurer=s subsequent burden of proving exclusion to deny
coverage, and insured=s subsequent burden to prove exception to exclusion). 
In addition to invoking the ensuing loss exception, the Lundstroms
invoked the accidental discharge provision in paragraph 9 under Coverage
B.  In the latter regard, the Lundstroms
referred to the Adamage caused by both the fire
sprinkler system and the overflow drain and scuppers@ and argued both of Athese systems@ were Apart of a buildings [sic] plumbing
system.@ 
As discussed in Part III.A.1, above, however, the summary judgment proof
establishes the May 2000 occurrence and the resulting loss at issue do not
involve these systems.  We therefore
focus instead on the mold exclusion and ensuing loss exception to the
exclusion.





[14]  At oral
argument, the Lundstroms= counsel contended the hole in the roof was not a
building defect.





[15]  In Fiess v.
State Farm Lloyds, however, the Fifth Circuit certified the following
question to the Texas Supreme Court:

 

Does the ensuing loss provision contained in Section I‑Exclusions,
part 1(f) of the Homeowners Form B (HO‑B) insurance policy as prescribed
by the Texas Department of Insurance effective July 8, 1992 (Revised January 1,
1996), when read in conjunction with the remainder of the policy, provide
coverage for mold contamination caused by water damage that is otherwise
covered under the policy?

 

392 F.3d 802, 811B12 (5th
Cir. 2004).  The Fifth Circuit declined
to render judgment based solely on Lambros because (1) Lambros is
30 years old, (2) it involved a homeowners policy that has subsequently been
changed, and (3) the ensuing loss provision at issue has been interpreted by
state and federal courts and the Texas Department of Insurance in a manner
inconsistent with Lambros.  Id. at
809 n.27.  The relevant provisions of the
two policies are not substantively different, however; and the supreme court
has never overruled the Lambros court=s
interpretation of the ensuing loss provision, an interpretation which has been
followed in published Texas case law decided after Lambros.





[16]  Accordingly,
we need not address the Lundstroms= issue
three in which they address an alternative ground on which the trial court
could have granted summary judgment.  See  Star‑Telegram, Inc. v. Doe, 915
S.W.2d 471, 473 (Tex. 1995).





[17]  See Tex. Bus.
& Com. Code Ann. '' 17.41B.885 (Vernon 2002 & Supp.
2005).





[18]  See Act of May
19, 1995, 74th Leg., R.S., ch 414, ' 11,
1995 Tex. Gen. Laws 2988, 2997B3000 (amended 1995, 2001) (repealed and recodified
2003) (current version at Tex. Ins. Code
Ann. ' 542.003 (Vernon Supp. 2005).





[19]  Despite
suggesting All-Around Plumbing, HDR, and Casteel were biased, the Lundstroms
point to no summary judgment proof to support such a claim.





[20]  Even if damage
allegedly resulting from the sprinkler system and the blocked scupper and
downspout were part of the Lundstroms= claim,
USAA had a reasonable basis on which to dispute coverage based on whether
either constituted a Aplumbing system.@  See Harrison v. U.S.A.A. Ins. Co., No.
03-00-00362-CV, 2001 WL 391539, at *3 (Tex. App.CAustin, April 19, 2001, no pet.) (not designated for
publication) (stating, APlumbing serves the essential purpose of supplying and
recirculating water and sewage and about a building,@ and ATypically, a building=s
plumbing system is considered to be the build-in network of pipes, fixtures,
appurtenances and appliances used for that purpose.@).





[21]  See Act of May 27, 1991, 72nd Leg.,
R.S., ch 242, ' 11.03, art. 21.55, 1991 Tex. Gen.
Laws 939, 1043B45 (repealed and recodified 2003)
(current version at Tex. Ins. Code Ann.
' 542.055 (Vernon Supp. 2005).  





[22]  See id.
art. 21.55, secs. 2(a)(1), 3(a), (f).





[23]  See
Allstate Ins. Co. v. Bonner, 51 S.W.3d 289, 291 (Tex. 2001) (stating, to
successfully maintain claim under article 21.55, section 6, party must
establish the following elements: (1) a claim under an insurance policy; (2)
that the insurer is liable for the claim; and (3) that the insurer has failed
to follow one or more sections of article 21.55 with respect to the claim).





[24]  The Lundstroms
complain in passing that USAA=s no evidence challenge to their article 21.55 claim
was Aimpermissibly vague.@  USAA, however, set forth each of the elements
for which it contended  the Lundstroms
had not produced, and could not produce, any evidence.  See Cuyler v. Minns, 60 S.W.3d 209,
212 (Tex. App.CHouston [14th Dist.] 2001, pet. denied) (reiterating
rule 166a(i)=s requirement that motion must be specific in
challenging the evidentiary support for an element of a claim or defense).